**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

NEW HORIZONS EDUCATION CORPORATION;
NEW HORIZONS FRANCHISING GROUP, INC.;
and LTSI Inc.,                                                      5:18-cv-01223 (BKS/DEP)

                                        Plaintiffs,

v.

KROLAK TECHNOLOGY MANAGEMENT OF
SYRACUSE, LLC; KROLAK TECHNOLOGY
MANAGEMENT LLC; JASON KROLAK; and
TODD KROLAK,

                                        Defendants.

_____

**Appearances:**

James P. Wright
Bond, Schoeneck & King PLLC
One Lincoln Center
110 West Fayette Street
Syracuse, NY 13202
_Attorneys for Plaintiffs New Horizons Education Corporation_
_and New Horizons Franchising Group, Inc._

Jeffrey J. Harradine
Ward Greenberg Heller & Reidy LLP
Legacy Tower
1800 Bausch & Lomb Place
Rochester, NY 14604
_Attorneys for Plaintiff LTSI Inc._

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        On October 15, 2018, Plaintiffs New Horizons Education Corporation, New Horizons

Franchising Group, Inc., and LTSI Inc. filed this action alleging that Defendants Krolak

Technology Management of Syracuse, LLC ("Krolak Syracuse"), Krolak Technology Management LLC ("Krolak Albany"), and Jason Krolak have violated sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a), through their unauthorized use of New Horizons' trademarks following Plaintiffs' termination of Defendants' franchise agreements. (Dkt. No. 1). In addition, Plaintiffs allege that these Defendants have engaged in trademark infringement in violation of New York common law, engaged in unfair competition, tortiously interfered with economic advantage, and, together with Defendant Todd Krolak, breached the franchise agreements. (*Id.*). Presently before the Court is Plaintiffs' motion for a temporary restraining order ("TRO") and preliminary injunction seeking to enjoin Defendants Krolak Syracuse, Krolak Albany, and Jason Krolak from, *inter alia*, continuing to use New Horizons' trademarks and operating computer training centers in the Syracuse and Albany areas. (Dkt. No. 5).[1] For the reasons that follow, Plaintiffs' motion for a TRO is granted.

## II. BACKGROUND[2]

### A. The Franchise Agreements and the Termination

New Horizons Franchising Group, Inc. ("New Horizons") "licenses independent computer training businesses as franchisees of New Horizons" and at present "has approximately 300 licensed franchisees" in "70 countries." (Dkt. No. 5-6, ¶ 2). New Horizons Education Corporation ("NHEC") has registered a number of "trade/service marks" with the United States Patent and Trademark Office (the "Marks"). (*Id.* ¶ 3). The Marks include "New Horizons," "New

---

[1] Plaintiffs note that Defendant Todd Krolak is named "by virtue of being a signatory to the Syracuse franchise agreement." (Dkt. No. 5-7, at 5 n.1). In their motion for emergency relief, Plaintiffs refer to "the Defendants" as Krolak Syracuse, Krolak Albany, and Jason Krolak, (*id.*), and the Court does here as well.

[2] The facts are taken from the affidavits and attached exhibits submitted in support of this motion. (*See* Dkt. Nos. 5-1 to 5-6, 7-9).

Horizons Online Live Learning," "New Horizons Online Anytime Learning," "Online Live,"

"Mentored Learning," and:



(*Id.* at 11–15). The Marks pertain to the services, software, and material NHEC provides,

including "Educational services—namely, conducting courses dealing with computer

operations," "Computer services—namely, providing Internet based training," "Multimedia

software recorded on CD-rom containing instructional materials pertaining to the use of

computer software and hardware," and "Printed instructional materials pertaining to the use of

computer software and hardware." (*Id.*). NEHC "has delegated to New Horizons the right to

license the use of these marks and other intellectual property" to New Horizons franchisees,

which, in turn, "provide computer skills and professional training to individuals." (Dkt. No. 5-6,

¶ 3).

On June 30, 2014, New Horizons, Krolak Albany, and Mr. Krolak entered into a

franchise agreement ("Albany Franchise Agreement"), giving Mr. Krolak "a nonexclusive

license and franchise to operate a New Horizons computer learning/training center for a specified

term within a specified territory in the greater Albany, New York area," which Mr. Krolak

opened in Latham, New York. (*Id.* ¶¶ 4, 6; *id.* at 17–117). On December 18, 2016 New Horizons,

Krolak Syracuse, and Mr. Krolak entered into a separate franchise agreement ("Syracuse

Franchise Agreement"),[3] pursuant to which Mr. Krolak began operating a second New Horizons

---

[3] The Court refers to the Albany Franchise Agreement and Syracuse Franchise Agreements collectively as the
"Agreements."

franchise in Syracuse, New York. (*Id.* ¶¶ 5, 7; *id.* at 119–225). In accordance with the Agreements, New Horizons provided Defendants with "confidential and trade secret information, including specialized training, customer, financial, marketing, operating and performance information," including New Horizons' "Confidential Operations Manual" ("COM"), which "sets forth New Horizons' proprietary standards and methods for operating a . . . franchise." (*Id.* ¶¶ 8–9). In addition, New Horizons provided Defendants with access to its "web based extranet, which contains confidential and proprietary products, documents, and class offerings for use in connection with operating a New Horizons franchise," as well as to a "software service that manages contacts, student enrollments, class inventories and accounts receivable." (*Id.* ¶¶ 10–11).

The Agreements require that Defendants Krolak Albany and Krolak Syracuse pay "certain royalties and fees to New Horizons." (*Id.* ¶ 14; *see, e.g.*, Dkt. No. 5-6, at 134 ("Payments By Franchisee")). In his declaration, Gregory Marsella, Senior Vice President and General Counsel for New Horizons and NHEC, states that Defendants breached the Albany and Syracuse Franchise Agreements "by failing to pay the royalties and fees due." (Dkt. No. 5-6, ¶ 15). In September 2016, Mr. Krolak, on behalf of himself and Krolak Albany, executed a promissory note and guaranty recognizing the past-due payments and agreeing to a payment schedule. (*Id.* ¶¶ 16–17; *id.* at 229–31). Defendants, however, continued to fail to make the required payments, and in July 2017, Mr. Krolak, on behalf of himself and Krolak Albany and Syracuse, executed two additional promissory notes and guaranties promising payments. (*Id.* ¶ 17; *id.* at 233–40). Defendants, however, continued to fail to make payments; consequently, on January 9, 2018, April 9, 2018, July 25, 2018, and August 16, 2016, Mr. Marsella sent Defendants letters regarding "Final Notice of Default Prior to Termination." (*Id.* ¶¶ 18–20; *id.* at 242–64).

As Defendants failed to make the payments required under the Agreements and guaranties, on August 27, 2018, Mr. Marsella issued a "Notice of Termination" letter to Krolak Syracuse. (*Id.* ¶ 21; *id.* at 266–68). On September 19, 2018, Mr. Marsella issued a nearly identical "Notice of Termination" letter to Krolak Albany. (*Id.* ¶ 21; *id.* at 270–72). Mr. Marsella advised Defendants in the termination letters that they were "obligated under Article XII" of the Agreements "to immediately take all measures to de-identify the Franchised Business" with New Horizons. (*Id.* at 267, 270). Section 12.1 of the Agreements states:

> (a) Except as otherwise set forth . . . in the event of termination or expiration of this Agreement . . . Franchisee shall forthwith discontinue the use and/or display of the Intellectual Property Rights including, without limitation, the Service Marks and cease distributing any and all materials containing or bearing the Intellectual Property Rights including, without limitation, the Service Marks, and shall not thereafter operate or do business under the Assumed Name or any other name or in any manner that might tend to give an average person the impression that Franchisee is in any way associated or affiliated with Franchisor, or any of the businesses conducted by it or the owner of the Intellectual Property Rights . . . .

> (b) In the event of termination . . . Franchisee shall promptly:

> > (i) remove at Franchisee's expense all signs erected or used by Franchisee which bear the Service Marks, or any word or mark indicating that Franchisee is associated or affiliated with Franchisor;

> > (ii) erase or obliterate from letterhead, stationery, printed matter, website, advertising or other forms used by Franchisee the Service Marks and any word or mark indicating that Franchisee is associated or affiliated with Franchisor;

> > (iii) cease using all other elements of the Intellectual Property Rights;

> > (iv) permanently discontinue any advertising of Franchisee which indicates directly or indirectly that Franchisee is associated or affiliated with Franchisor; and

> > (v) refrain from doing anything which would indicate that Franchisee is or ever was an authorized Franchisee

> including without limitation indicating (directly or
> indirectly) that Franchisee was licensed to use the
> Intellectual Property Rights or any other distinctive
> System features or that Franchisee at any time operated
> under any name, word or mark associated or affiliated
> with Franchisor.

(*Id.* at 59–60, 164).

On September 13, 2018, Mr. Marsella sent a letter to Mr. Krolak and Krolak Syracuse referencing the termination letter and stating that "[w]e trust that the de-identification process is well underway and will be completed shortly." (*Id*. at 280). Mr. Marsella further noted that New Horizons had "recently learned that you continue to Act as a Computer Learning Center in violation of Section 8.10(f) of the Agreement," and demanded that Defendants "immediately cease from engaging in any activities which constitute Acting as a Computer Learning Center." (*Id.* at 281). New Horizons' September 19, 2018 termination letter to Krolak Albany similarly requested that Defendants "immediately cease from engaging in any activities which constitute acting as a Computer Learning Center." (*Id*. at 278).

The confidentiality and non-compete provisions in section 8.10 of the Agreements, which purport to allow for the entry of a temporary restraining order or injunctive relief, provide as follows:

> (f) Neither Franchisee nor any Equity Holder shall engage in
> activities that constitute Acting as a Computer Learning Center
> with respect to any business other than the Franchised Business . . .
> for a period of one year after the termination of this Agreement for
> any reason either within the Territory or within 25 miles of any
> Network Center.
>
> . . .
>
> (j) . . . Franchisee also understands and agrees that Franchisor will
> suffer irreparable injury not capable of precise measurement in
> money damages if Franchisee or any Covered Person breaches the
> covenants set forth in this Section 8.10. Accordingly, if a breach

occurs, Franchisee and the Equity Holders, on behalf of itself and each Covered Person, each hereby consents to entry of a temporary restraining order or other injunctive relief as well as to any other equitable relief which may be granted by a court having proper jurisdiction, without the requirement that Franchisor post bond or comparable security. Franchisee and the Equity Holders, on behalf of itself and each Covered Person, each hereby further agree that the award of equitable remedies to Franchisor in the event of such breach is reasonable and necessary for the protection of the business and goodwill of Franchisor.

(*Id.* at 49, 151).[4]

On September 24, 2018, an attorney representing Krolak Albany and Krolak Syracuse, Paul Marthy, sent a letter to New Horizons stating that, "[f]ollowing termination" of the franchises, Mr. Krolak "made a request that his obligations under the non-compete agreements in connection with both franchises be waived," and that he has not heard back from New Horizons. (*Id.* at 274). Mr. Marsella responded in a letter dated September 27, 2018, enclosing his prior letters, and noting that New Horizons has clearly demanded that Defendants comply with the non-compete provisions. (*Id.* at 276). Mr. Marsella noted that if the Defendants continued to "engage in competitive activities in violation" of the agreements, New Horizons would seek injunctive relief in court. (*Id.*).

---

[4] The Agreements define "Acting as a Computer Learning Center" as follows:

> (i) the sale and delivery of [instructor-led computer and professional skills classroom training]; (ii) the sale and/or delivery of [computer-based training] and other methods of asynchronous and synchronous online training; (iii) the operation of eBusiness and the sale and delivery of eLearning and other forms of electronic training enabled by the Internet or comparable or enhanced forms of electronic technology now existing or hereinafter developed; (iv) the delivery or performance of other computer and professional skills training services that Franchisor incorporates in the System; (v) the sale and delivery of computer and professional skills classroom training through Mentored Learning; and (vi) the sale of Classroom Learning Content and other training products, including third party content vendors' products, all of which shall be performed or conducted in accordance with this Agreement.

(Dkt. No. 5-6, at 23, 125). The franchise territories are described in Exhibit A to each agreement, which are attached hereto as Exhibits A and B, for the Syracuse and Albany territories, respectively. (*Id*. at 70, 174).

**B.     Defendants' Conduct Following the Termination of the Agreements**

In a declaration Joseph Mignano, Vice-President and General Manager, Training

Delivery of Logical Operations, Inc., an affiliate company of LTSI, states that on September 20,

2018, following the termination of the Agreements, LTSI "assumed both franchises." (Dkt. No.

5-4, ¶ 4). "With New Horizons' permission, LTSI markets computer training classes" in

Syracuse and Albany using the New Horizons logo. (*Id.*). Mr. Mignano states:

> As explained more fully in the Declarations of Sam William, Grant
> LeSchander (both of whom are account executives that I manage
> and who are responsible for the Greater Syracuse market), and
> Marianna Zimmer (Logical Operations' Director of Student
> Services), LTSI has received complaints from clients that Mr.
> Krolak continues to accept payments from clients under the New
> Horizons name, and continues to offer competing training course
> offerings.

(*Id.* ¶ 6). Mr. Mignano further avers the following:

> On September 25, 2018, I traveled to 15 Cornell Road in Latham
> in order to determine whether Krolak has ceased training
> operations. I specifically saw New Horizons signage on the door to
> the lobby (as well as the door to the training center) being operated
> by Krolak, and observed a functioning training center, with testers
> and students visible.
>
> . . .
>
> Having observed these indicators, I went into the facility and spoke
> with the receptionist. She informed me that training classes were in
> fact being conducted. I was also able to pick up a business card for
> a senior instructor, Darren Wood, which used the New Horizons'
> logo.

(*Id.* ¶¶ 9–10). Mr. Mignano has provided pictures of the signage. (*Id.* ¶ 9).

According to the declaration of Grant LeSchander, who was employed by Krolak

Syracuse until "late August" 2018, Mr. Krolak "continued to sell computer training services" and

"computer training classes" in "late August," September, and October. (Dkt. No. 5-2, ¶¶ 4–5).

Mr. LeSchander, who is now employed by an affiliate of Plaintiff LTSI, explains that he "was

informed by the IT Support Administrator" for a client in Norwich, New York, "in both that September and early October that Mr. Krolak was offering . . . computer training classes" and had "[e]vidently" "accepted an order from the client "after the Syracuse franchise was closed." (*Id.*).

In a declaration, Sam William, who was also employed by Krolak Syracuse and later hired by an affiliate of Plaintiff LTSI, states that he has "received information showing that Mr. Krolak continued to solicit business under the New Horizons name." (Dkt. No. 5-3, ¶ 4). Mr. William provided a copy of the following email:

**From:** Jason Krolak [mailto:jkrolak@nhupstate.com]
**Sent:** Thursday, September 6, 2018 1:54 PM
**To:** Maureen Ray
**Subject:** RE: Voicemail

Maureen,

Sam is no longer with our company so I will be assisting you from here.

Do you have time this afternoon to discuss this training further?

**Jason Krolak | Owner**
**New Horizons Computer Learning Center of Albany and Syracuse**
**Local Instruction. Global Presence. Limitless Possibilities.**

**Albany Center:** 15 Cornell Road **|** Latham, NY 12110
**Phone:** (518) 452-6444 **| Fax:** (518) 452-8099
Visit us at www.nhupstate.com



(*Id.* ¶ 5).

In a declaration, Ms. Zimmer, Director of Student Services and Sales Operations Managers of Logical Operations, Plaintiff LTSI's affiliate, states:

> On October 10, 2018, I received a telephone call from Mr. Steve Doss of Anaren Microwave, a company located within the region covered by the Syracuse New Horizons franchise managed by Logical Operations.

As reported by Mr. Doss, a couple of days prior, he was contacted by Mr. Jason Krolak. Evidently, prior to the loss of his New Horizons franchise rights in Syracuse, Mr. Krolak had offered training services to Anaren Microwave. Mr. Krolak hoped to "lock down" this sale of training services.

I explained to Mr. Doss that Mr. Krolak's franchise rights had been revoked. Mr. Doss expressed his confusion as to how Mr. Krolak could nonetheless be offering training services.

(Dkt. No. 5-5, ¶¶ 3–5).

## III. MOTION FOR TRO AND PRELIMINARY INJUNCTION

On October 15, 2018, Plaintiffs filed the instant Complaint. (Dkt. No. 1). On October 16, 2018, Plaintiffs filed a motion for a TRO and preliminary injunction. (Dkt. No. 5). Specifically, Plaintiffs seek a TRO enjoining Defendants from (i) "using New Horizons' Registered Trade/Service Marks"; (ii) "operating a computer learning/training center within the greater Syracuse area"; (iii) "operating computer learning/training center within the greater Albany area"; and (iv) "otherwise marketing, promoting, advertising and/or selling computer learning/training services within the greater Syracuse and Albany areas." (Dkt. No. 8-1, at 4–5).

On October 16, 2018, after reviewing Plaintiffs' motion, the Court set an expedited briefing schedule. (Dkt. No. 6). On October 17, 2018, Plaintiffs' counsel filed an affidavit indicating that they had "engaged a process server to serve the Summons, Complaint, and Order to Show Cause with supporting documents on Defendant Jason Krolak individually, and as member and officer of Krolak Technology Management of Syracuse LLC and Krolak Technology Management LLC, as well as Todd Krolak," and that service would be effected by October 18, 2018. (Dkt. No. 9, ¶ 6.). Plaintiffs' counsel further stated that he had sent a copy of the motion papers to Justin Heller, an attorney that one or more of the Defendants had retained in connection with "a forthcoming bankruptcy petition and proceeding," and that Mr. Heller responded that he had not been retained to represent Defendants in connection with this action

and that he expected that a bankruptcy petition "on behalf of certain of the Defendants" would be filed "next week." (*Id.* ¶¶ 3–4). In addition, according to Plaintiffs' counsel, Mr. Heller stated that he did "not believe [Defendants] intend to retain counsel for this matter" and that he believed Defendants' "expectation is that the bankruptcy filing will stay the federal court action." (*Id.* ¶ 5). Citing "the apparent imminence of Defendants' bankruptcy filing" and the "risk of continued, irreparable harm to Plaintiffs' businesses and intellectual property rights," Plaintiffs renewed their request for a TRO. (*Id.* ¶ 8). The same day, the Court issued an Order setting a telephone conference for October 18, 2018 at 3 p.m., and directing that Plaintiffs serve the Order as well as their motion papers by 12:00 p.m. on October 18, 2018. (Dkt. No. 10). The Order provided Defendants with instructions concerning how to participate in the telephone conference in the event they wished to do so. (*Id.*).

On October 18, 2018, Plaintiffs filed an affidavit of service indicating that they had emailed copies of the motion papers and the Court's October 18, 2018 Order to Mr. Heller and Attorney Paul Marthy, the author of the September 24, 2018 letter on behalf of the Defendants, and sent copies of these papers to Mr. Krolak via overnight mail. (Dkt. No. 11). Counsel for Plaintiff LTSI Inc. stated that to the best of his knowledge Mr. Krolak is the managing member of Krolak Albany and Krolak Syracuse. (*Id.* ¶ 5). During the 3:00 p.m. telephone conference, in which Defendants did not participate, Plaintiffs' counsel advised that: (1) Mr. Marthy had forwarded by email the motion papers and the Court's Order to Mr. Krolak; and (2) a process server had left the motion papers and the Court's Order at Mr. Krolak's residence that morning.

While Defendants have not appeared in this action or made any attempt to contact the Court, based on the showing made by Plaintiffs' counsel, including the representation that Mr. Marthy provided the motion papers and the Court's Order setting the telephone conference to

Mr. Krolak, the Court concludes that Defendants had notice of the application for a TRO. Even assuming this notice was insufficient, Rule 65(b) provides that a court may issue a TRO "without written or oral notice to the adverse party or its attorney only if":

> (A)   specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B)   the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b). For the reasons discussed below, the Court finds that based on the evidence of Defendants' ongoing activities and unauthorized use of Plaintiffs' Marks, Plaintiffs have presented "specific facts in an affidavit . . . clearly show[ing] that immediate and irreparable injury . . . will result before" Defendants can be heard in opposition. *Id.* Of course, Defendants may at any time on "2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court— . . . appear and move to dissolve or modify the order." Fed. R. Civ. P. 65(b)(4).

## IV.   STANDARD OF REVIEW – RULE 65

Rule 65 of the Federal Rules of Civil Procedure governs temporary restraining orders and preliminary injunctions. In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction. *Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd*, 557 F. App'x 53 (2d Cir. 2014); *AFA Dispensing Grp. B.V. v. Anheuser–Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("It is well established that the standard for an entry of a temporary restraining order is the same as for a preliminary injunction."). "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving

party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

Generally, preliminary injunctions are prohibitory or mandatory. *Id.* "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.* The "status quo . . . is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014)). A party seeking a mandatory injunction "must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012).

Here, Plaintiffs seek an order that directs Defendants to stop using New Horizons' Marks and enforces the Agreements. This is a request for prohibitory relief. *See, e.g.*, *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006) ("[I]n the typical trademark case a prohibitory injunction seeks to stop alleged infringement."); *Solomon Agency Corp. v. Choi*, No. 16-cv-0353, 2016 WL 3257006, at *2, 2016 U.S. Dist. LEXIS 75949, at *7 (E.D.N.Y. May 16, 2016) (characterizing as prohibitory an injunction sought in connection with enforcement of non-compete clause, explaining that "courts in this Circuit routinely apply the ordinary standard when deciding whether to issue an injunction in connection with an employment contract").

## V.    ANALYSIS

### A.    Irreparable Harm

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "Irreparable

harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be

remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*,

787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of North*

*Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)).

### 1. Trademark Infringement

Here, Plaintiffs have adduced evidence that they will be irreparably harmed in the

absence of a TRO enjoining Defendants from using New Horizons' Marks. There is evidence

that Defendants have used New Horizons' Marks a number of times following the termination of

the Syracuse and Albany Franchise Agreements in connection with solicitation of business and

continue to have New Horizons signage at the Albany location, which is apparently still

operative. (*See, e.g.*, Dkt. No. 5-3, ¶ 5, Dkt. No. 5-4, ¶¶ 9–11). Plaintiffs have also presented

evidence that customers seeking computer training services have been confused. *See*, *e.g*., Dkt.

No. 5-3, ¶¶ 5-7 (customer terminated contacts with Mr. Krolak and Krolak Albany after

discovering that Defendants were not authorized to offer New Horizons' training); Dkt. No. 5-5,

¶¶ 3-7 (customer in the Syracuse area confused by Mr. Krolak's offer of training services after

his franchise rights had been revoked).  On these facts, there is a sufficient showing of

irreparable harm: the reputation and goodwill[5] that New Horizons has cultivated is undermined

so long as Defendants, who are no longer licensed franchisees and therefore out of New

Horizons' control, continue to use New Horizons' Marks. *See Sunward Electronics, Inc. v.*

*McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) ("[W]hen in the licensing context unlawful use and

consumer confusion have been demonstrated, a finding of irreparable harm is automatic.")

---

[5] "Although not readily defined, good will has recently been described as the 'expectancy of continued patronage.'"
*Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 195 (E.D.N.Y. 2013) (quoting *Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*, No. 10-cv-8976, 2011 WL 497978, at *6, 2011 U.S. Dist. LEXIS 14524, at *17 (S.D.N.Y. Feb. 10, 2011).

(citation omitted); *7–Eleven, Inc. v. Khan*, 977 F. Supp. 3d 214, 234 (E.D.N.Y. 2013) ("7–Eleven does not need to show Dhaliwal will take actions through his management of the Rocklin Store that will damage 7–Eleven's goodwill or reputation; regardless of the care that Dhaliwal takes while running the store, 7–Eleven still has the right to maintain control over its trademarks to prevent customer confusion.") (citation omitted).

### 2. Restrictive Covenant

"Though courts often issue preliminary injunctions when it appears likely that the plaintiff will prevail in covenant-not-to-compete cases, this is not an automatic process, but instead depends upon the factual particulars in each case." *Baker's Aid v. Hussman Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987). Generally, however, "when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004).

Here, Plaintiffs have presented evidence showing that Defendants have continued to offer computer training services in the Syracuse region as recently as early October 2018 to a client who subsequently contacted Logical Operations, the New Horizons franchisee that replaced Krolak Syracuse, to express confusion about "how Mr. Krolak could . . . be offering training services" when the "franchise rights had been revoked." (Dkt. No. 5-5, ¶¶ 3–5). Further, according to Mr. Mignano, Plaintiff LTSI and Logical Operations "have received numerous complaints from . . . clients who have recently purchased New Horizons training courses" from Mr. Krolak, "but have not received the purchased training." (Dkt. No. 5-4, ¶ 15). These facts are sufficient to show that, without an injunction enforcing the restrictive covenants in the

Agreements, New Horizons will suffer harm to their goodwill that cannot be adequately compensated with money damages.

### 3. Consent to TRO

In support of their contention that they will suffer irreparable harm, Plaintiffs rely on the provision in both Agreements in which Defendants purportedly acknowledged "that Franchisor will suffer irreparable injury not capable of precise measurement in money damages if Franchisee or any Covered Person breaches the covenants set forth in this Section 8.10," consented "to entry of a temporary restraining order or other injunctive relief as well as to any other equitable relief," and agreed "that the award of equitable remedies to Franchisor in the event of such breach is reasonable and necessary for the protection of the business and goodwill of Franchisor." (Dkt. No. 5-6, at 49, 151). This provision may be viewed as an admission that Plaintiffs will suffer irreparable harm, *see Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (observing that the provision in the employment contract, which indicated that in the event of "breach of the post-employment competition provision, Ticor shall be entitled to injunctive relief, because it would cause irreparable injury," "might arguably be viewed as an admission by Cohen that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision"), but is "merely one factor," in addition to those discussed above, that the Court has considered "in deciding whether irreparable harm would result if an injunction did not issue," *Markovits v. Venture Info Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001).

### B. Likelihood of Success

### 1. Trademark Infringement

"A claim of trademark infringement, whether brought under 15 U.S.C. § 1114(1) (for infringement of a registered mark) or § 1125(a) (for infringement of rights in a mark acquired by

use), is analyzed under a two-prong test, which requires courts to consider: (1) "whether the plaintiff's mark is entitled to protection," and (2) "whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). "Registered trademarks are presumed to be valid and are thus protected." *Dunkin' Donuts Franchised Rests. LLC v. Tim & Tab Donuts, Inc.*, No. 07-cv-3662, 2009 WL 2997382, at *7, 2009 U.S. Dist. LEXIS 83798, at *21 (E.D.N.Y. Sept. 15, 2009) (citing 15 U.S.C § 1065).

As to the first prong, Plaintiffs have adduced sufficient evidence to show, at this stage, that the Marks at issue are registered trademarks and thus entitled to protection. Regarding the second prong, "[a]s a matter of law, '[t]here is a great likelihood of confusion when the infringer uses the exact trademark' as the plaintiff.'" *Id.* at *8 (quoting *Dunkin' Donuts, Inc. v. Northern Queens Bakery, Inc.*, 216 F. Supp. 2d 31, 44 (E.D.N.Y. 2001)). In cases involving former licensees, "there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder." *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004). Here, there is evidence that Defendants are using the New Horizons Marks on signage, in email, and on business cards despite having been terminated as a franchisee and thus no longer licensed to use the Marks, and Plaintiffs have provided specific evidence of customer confusion. Thus, Plaintiffs have sufficiently shown a likelihood of success on their trademark infringement claim.

## 2. Restrictive Covenant

"Courts analyze restrictive covenants in commercial contracts, such as license agreements, 'under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract.'" *Crye Precision LLC v. Bennettsville Printing*, No.

15-cv-00221, 2017 WL 4325817, at *8, 2017 U.S. Dist. LEXIS 159072, at *21 (E.D.N.Y. Sept. 27, 2017) (quoting *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 197 (E.D.N.Y. 1999)). Courts consider three factors: "(1) whether the covenant protects a legitimate business interest, (2) the reasonableness of the covenant with respect to geographic scope and temporal duration, and (3) the degree of hardship imposed upon the party against whom the covenant is enforced." *Id.* "[A]pplication of these factors depends on "the totality of the circumstances." *Id.* (quoting *Greenwich Mills Co. v. Barrie House Coffee Co.*, 91 A.D.2d 398, 401 (2d Dep't 1983)).

Here, the Agreements explain that in view of the "valuable specialized training and trade secrets, including . . . technology, software . . . strategies and financial, marketing . . . product and business development plans, customer information, outsourcing strategies and information regarding the operational, sales, promotional and marketing methods and techniques," as well as "the use and license of [New Horizons'] Confidential Information," the franchisees agreed that upon termination they would not "engage in activities that constitute Acting as a Computer Learning Center "for a period of one year after the termination of this agreement . . . within the [franchise] territory." (Dkt. No. 5-6, at 49, 151). The Agreement, therefore, appears to protect Plaintiffs' business interest in its intellectual property and against unfair competition in the delineated franchise territories. (Dkt. No. 7, at 4–14). *See DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 198–99 (E.D.N.Y. 1999) ("For DAR now to use what it has gained from Uniforce in order to compete against Uniforce would amount to unfair competition and would impede Uniforce's ability to secure another franchise in the territory.").

Here, the geographic scope is limited to the franchise territories, and the temporal duration is one year. Once New Horizons terminated the Agreements, LTSI entered franchise

agreements to take over the Syracuse and Albany territories. Under these circumstances, the Court finds that Plaintiffs have established a likelihood of success on their claim that the limitation on Defendants' provision of computer training services for a period of one year in the franchise territories is reasonably related to New Horizons' interests in protecting its goodwill and intellectual property in these areas. *See DAR & Assocs.*, 37 F. Supp. 2d at 199 (finding two-year period and fifty-mile geographic limitation on former franchisee to be "reasonably related to Uniforce's interest in protecting its goodwill, know-how, and other proprietary information, and to its wholly legitimate desire to install a viable Maryland franchise in place of" the former licensee).

### C.     Balance of the Hardships

"[A] court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010). Plaintiffs have presented evidence that Defendants continue to sell computer training services in the Syracuse and Albany areas in connection with New Horizons' Marks despite the termination of the Agreements and that there is confusion among their clients concerning the validity of Defendants' operations. (Dkt. No. 5-2, ¶ 6; Dkt. No. 5-3, ¶ 5; Dkt. No. 5-4, ¶¶ 9–13). This suffices to show Plaintiffs are at risk of continued loss of goodwill and control of their reputation. While enjoining Defendants from selling or continuing to provide computer training services in the Syracuse and Albany areas will no doubt be a hardship, there is no perceivable hardship to Defendants in discontinuing use of the Marks. Thus, on balance, the Court concludes that Plaintiffs' potential loss of goodwill and control over the New Horizons' Marks outweighs this hardship.

## D.     Public Interest

Plaintiffs argue that there is an interest in protecting the public from the "confusion, deception and mistake" caused by Defendants' activities and unauthorized use of the Marks. (Dkt. No. 5-7, at 20). The Second Circuit has long held that there is a "strong interest in preventing public confusion." *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 505 (S.D.N.Y. 2013) (quoting *ProFitness Phys. Therapy Ctr. v. Pro–Fit Ortho. & Sports Phys. Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002)). The Court therefore concludes that, based on the evidence showing client confusion as a result of Defendants' activities and use of the Marks, the public interest would be served by issuance of the TRO.

## E.     Security

"The Rule 65(c) security requirement is designed to 'assure[] the [restrained] party that it may readily collect damages from the funds posted in the event that it was wrongfully [restrained], and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff.'" *U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 135 (2d Cir. 2014) (alterations in original) (quoting *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011)). "Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm, or where the injunctive order was issued to aid and preserve the court's jurisdiction over the subject matter involved." *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (internal quotation marks omitted).

In the Agreements, the parties agreed that in the event New Horizons files an action for injunctive relief, it may do so "without the necessity of posting any bond (and if bond shall nevertheless be required . . . the parties agree that the sum of $100 shall be sufficient bond)."

(Dkt. No. 5-6, at 59, 163). The parties may agree to waive the bond requirement. *Singas Famous Pizza Brands Corp. v. New York Advertising LLC*, No. Civ. 8976 (RJH) 2011 WL 497978, at *12, 2011 U.S. Dist. LEXIS 14524, at *38 (S.D.N.Y. Feb. 10, 2011); *Marsh USA Inc. v. Karaskai*,, No. 08 Civ. 4195 (JGK), 2008 WL 4778239, at *21, 2008 U.S. Dist. LEXIS 90986, at *67 (S.D.N.Y. Oct. 31, 2008). The Court notes, however, that this contract language is not binding on the Court, *Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 538 (S.D.N.Y. 2016), and "the bond needed for the Temporary Restraining Order is properly considered as separate and distinct from the bond issued for the . . . Preliminary Injunction." *PLC Trenching Co., LLC v. Newton*, No. 6:11-CV-0515, 2011 WL 13135653, at *12, (N.D.N.Y. Dec. 12, 2011).[6] The Court will therefore address any argument concerning the appropriate bond for a preliminary injunction at the upcoming hearing and, at this time imposes no bond in accord with the parties' agreement.

## VI.     CONCLUSION

For these reasons, it is

**ORDERED** that Plaintiffs' request for a TRO is granted; and it is further

**ORDERED** that Defendants are enjoined from: (i) using New Horizons' Registered Trade/Service Marks; (ii) operating a computer learning/training center within the greater Syracuse and greater Albany areas, consisting of the zip codes and territory set forth in Exhibits A and B attached hereto; and (iii) otherwise marketing, promoting, advertising and/or selling computer learning/training services within the greater Syracuse and Albany areas, consisting of the zip codes and territories set forth in Exhibits A and B attached hereto; and it is further

---

[6] No LEXIS cite available.

**ORDERED** that Plaintiffs personally serve a copy of this TRO on Defendants by

October 23, 2018; and it is further

**ORDERED** that this TRO is valid for 14 days from the date of issuance and expires on

November 5, 2018; and it is further

**ORDERED** that an evidentiary hearing on the motion for preliminary injunction (Dkt.

No. 5) is set for November 2, 2018, at 10:00 a.m.

**IT IS SO ORDERED.**

Time:   4:05 p.m.
Dated: October 22, 2018
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge

# EXHIBIT A

# EXHIBIT A TO FRANCHISE AGREEMENT

## DESCRIPTION OF TERRITORY; PERFORMANCE REQUIREMENTS

1.  The Territory licensed to Franchisee is described as follows:

    a.  The name of the area defined in this exhibit is Syracuse, New York.

    b.  The territory consists of the zip code list and territory map.

2.  The size of the area defined in this exhibit is:

| MARKET CATEGORY | TERRITORY POPULATION AS OF EFFECTIVE DATE OF FRANCHISE AGREEMENT |
|---|---|
| MED | 1,590,237 |

| | | | |
|---|---|---|---|
| 13862 | 13827 | 14825 | 13743 |
| 13863 | 13830 | 14838 | 13040 |
| 13905 | 13832 | 14844 | 13730 |
| 13844 | 13833 | 14872 | 13732 |
| 13845 | 13835 | 14850 | 13733 |
| 13848 | 13813 | 13797 | 13734 |
| 13841 | 14894 | 14852 | 13736 |
| 13840 | 13904 | 14853 | 13760 |
| 13864 | 14881 | 14854 | 13738 |
| 13865 | 14882 | 14859 | 13460 |
| 13901 | 14883 | 14861 | 13744 |
| 13902 | 14886 | 14864 | 13745 |
| 13903 | 14871 | 14845 | 13746 |
| 13801 | 14892 | 13802 | 13748 |
| 13851 | 14867 | 13778 | 13749 |
| 13815 | 14901 | 13761 | 13754 |
| 13850 | 14902 | 13762 | 13758 |
| 13803 | 14903 | 13777 | 13737 |
| 13809 | 14904 | 13780 | 13129 |
| 13811 | 14905 | 13784 | 13053 |
| 13812 | 14925 | 13787 | 13056 |
| 13843 | 14889 | 13790 | 13062 |
| 13814 | 14851 | 13794 | 13068 |
| 14814 | 14816 | 13795 | 13073 |
| 13826 | 14817 | 13763 | 13087 |

| | | | |
|---|---|---|---|
| 13101 | 13480 | 13465 | 13218 |
| 13464 | 13501 | 13421 | 13219 |
| 13124 | 13495 | 13418 | 13220 |
| 13045 | 13494 | 13502 | 13214 |
| 13136 | 13492 | 13036 | 13224 |
| 13141 | 13490 | 13157 | 13212 |
| 13155 | 13476 | 13328 | 13235 |
| 13158 | 13483 | 13403 | 13244 |
| 13332 | 13471 | 13401 | 13250 |
| 13411 | 13479 | 13363 | 13251 |
| 13092 | 13402 | 13362 | 13252 |
| 13102 | 13408 | 13354 | 13260 |
| 13077 | 13042 | 13352 | 13221 |
| 13438 | 13477 | 13309 | 13205 |
| 13461 | 13417 | 13338 | 13364 |
| 13456 | 13486 | 13313 | 13164 |
| 13455 | 13054 | 13323 | 13201 |
| 13449 | 13308 | 13322 | 13202 |
| 13442 | 13304 | 13321 | 13215 |
| 13469 | 13303 | 13319 | 13204 |
| 13440 | 13301 | 13318 | 13028 |
| 13478 | 13162 | 13409 | 13206 |
| 13435 | 13413 | 13341 | 13207 |
| 13425 | 13123 | 13225 | 13208 |
| 13424 | 13316 | 13153 | 13209 |
| 13441 | 13484 | 13217 | 13210 |

| | | | |
|---|---|---|---|
| 13211 | 13116 | 13082 | 13140 |
| 13203 | 13084 | 13346 | 13024 |
| 13030 | 13110 | 13334 | 13118 |
| 13078 | 13108 | 13314 | 13355 |
| 13066 | 13104 | 13310 | 13113 |
| 13063 | 13090 | 13163 | 13111 |
| 13060 | 13089 | 13475 | 13081 |
| 13057 | 13290 | 13122 | 13071 |
| 13261 | 13119 | 13324 | 13064 |
| 13031 | 13044 | 13072 | 13034 |
| 13088 | 13051 | 13061 | 13139 |
| 13029 | 13406 | 13052 | 13121 |
| 13027 | 13329 | 13043 | 13302 |
| 13020 | 13472 | 13037 | 13167 |
| 13599 | 13454 | 13035 | 13145 |
| 13505 | 13431 | 13134 | 13144 |
| 13504 | 13420 | 13331 | 13142 |
| 13041 | 13491 | 13022 | 13135 |
| 13112 | 13407 | 13021 | 13132 |
| 13503 | 13032 | 13026 | 13426 |
| 13159 | 13365 | 13033 | 13126 |
| 13152 | 13361 | 13117 | 13115 |
| 13138 | 13357 | 13166 | 13114 |
| 13137 | 13350 | 13160 | 13107 |
| 13120 | 13340 | 13156 | 13103 |
| 13080 | 13416 | 13147 | 13093 |

13083

13076

13074

13131

13493

13039

13069

13437



# EXHIBIT B

EXHIBIT A TO FRANCHISE AGREEMENT

DESCRIPTION OF TERRITORY; PERFORMANCE REQUIREMENTS

1.  The Territory licensed to Franchisee is described as follows:

    a.  The name of the area defined in this exhibit is Albany, New York.

    b.  The territory consists of the zip code list and territory map:

2.  The size of the area defined in this exhibit is:

| MARKET CATEGORY | TERRITORY POPULATION AS OF EFFECTIVE DATE OF FRANCHISE AGREEMENT |
|:---:|:---:|
| S-1 | 847,193 |

| | | | |
|---|---|---|---|
| 12007 | 12063 | 12144 | 12198 |
| 12008 | 12065 | 12147 | 12201 |
| 12009 | 12067 | 12148 | 12202 |
| 12018 | 12074 | 12150 | 12203 |
| 12019 | 12077 | 12151 | 12204 |
| 12020 | 12082 | 12153 | 12205 |
| 12022 | 12084 | 12154 | 12206 |
| 12023 | 12085 | 12156 | 12207 |
| 12024 | 12089 | 12158 | 12208 |
| 12027 | 12090 | 12159 | 12209 |
| 12028 | 12094 | 12161 | 12210 |
| 12033 | 12107 | 12168 | 12211 |
| 12040 | 12110 | 12169 | 12212 |
| 12041 | 12111 | 12170 | 12214 |
| 12045 | 12118 | 12179 | 12220 |
| 12046 | 12120 | 12180 | 12222 |
| 12047 | 12121 | 12181 | 12223 |
| 12052 | 12123 | 12182 | 12224 |
| 12053 | 12128 | 12183 | 12225 |
| 12054 | 12133 | 12185 | 12226 |
| 12055 | 12137 | 12186 | 12227 |
| 12056 | 12138 | 12188 | 12228 |
| 12057 | 12140 | 12189 | 12229 |
| 12059 | 12141 | 12193 | 12230 |
| 12061 | 12143 | 12196 | 12231 |

| | |
|---|---|
| 12232 | 12288 |
| 12233 | 12301 |
| 12234 | 12302 |
| 12235 | 12303 |
| 12236 | 12304 |
| 12237 | 12305 |
| 12238 | 12306 |
| 12239 | 12307 |
| 12240 | 12308 |
| 12241 | 12309 |
| 12242 | 12325 |
| 12243 | 12345 |
| 12244 | 12469 |
| 12245 | 12801 |
| 12246 | 12803 |
| 12247 | 12822 |
| 12248 | 12831 |
| 12249 | 12833 |
| 12250 | 12835 |
| 12252 | 12850 |
| 12255 | 12859 |
| 12256 | 12863 |
| 12257 | 12866 |
| 12260 | 12871 |
| 12261 | 12884 |
| 12262 | |

